22-7134, John Does 1-3-7, Appellant v. Saladin et al., Mr. Thornton for the Appellant, Ms. Anders for the Appellee International Bank for Reconstruction and Development, Mr. Newland for the Appellee International Monetary Fund. Good morning, counsel. Good morning. Mr. Thornton, please proceed when you're ready. May it please the court. I'm going to take a few minutes to set the stage here. The appellants in this case are seven victims of Taliban terror attack, and they hold a judgment against the Taliban. On August 15, 2021, the Taliban took over Afghanistan, and a few things soon made it appear to us that the Garnishes likely held blocked assets of an instrumentality of the Taliban. First, the Taliban had long been blocked by IEPA. Then there were a series of news reports in the Wall Street Journal, New York Times, and Washington Post. The first being that the president had frozen Afghan Central Bank assets. Second, that the IMF was set to pay $400 million to the Taliban, according to a prior agreement. And the third was that the IMF and the World Bank had both frozen those payments to Afghanistan or payments to Afghanistan. And this is in the context of the Taliban being a totalitarian state that was taking over all the major institutions in Afghanistan, and so made it very likely that payments on the scale that these entities operate were going to an instrumentality of the Taliban. So we requested, and the D.C. clerk issued, free a writ of attachment containing interrogatories and attachment and serve them on the Garnishes. Neither Garnishes ever answered those writs, and they didn't file a motion to quash within the response time. After the time to reply had passed, we moved for a condemnation judgment, and the court set our motion for judgment aside and entertained belated notions from the Garnishes arguing that they had absolute immunity. Neither Garnishe put in any evidence other than a treasury license issued the day after the service of the writ, and the district court denied our motion for judgment, quashed the writs, finding that TRIO was not triggered, and so it lacked subject matter jurisdiction, and it didn't rule in the claimed immunities or whether TRIO overcame them. So the questions now are, should this court affirm the district court's ruling that the Garnishes simply don't hold assets of other entities? Should it affirm the finding that payments intended for a recipient but not yet received by that recipient are not assets of that entity? Alternatively, should it affirm the grounds that the Garnishes have absolute immunities that aren't overcome by TRIO? And if not, is there something about the owners of the assets, and despite the fact that we don't know who those are because they didn't answer the interrogatories, that divests the courts of jurisdiction and supports affirmance? So I'm going to go through the first two rather quickly. The argument that the Garnishes hold no assets of anybody, that finding, well, there was no evidentiary basis at all for that finding, and it was belied by references in the papers that the World Bank holds a trust fund in the IMF special drawing rights, which sound a lot like the credits that are referred to in the interrogatories, turning to the second holding that the payments not yet made are not assets of an entity. That was gleaned from the UCC's treatment of misfired wire transfers, but this isn't a wire transfer case, and this court had already limited the application of that doctrine, even in a wire transfer TRIO case, in the estate of Levin case in 2022. But a rule that you can't garnish payments that have not yet been received by the recipient would obliterate an entire category of garnishing payments, and that's why there's two questions in the interrogatories. Do you hold assets of, are you indebted to the judgment debtor, or in this case, an instrumentality of the judgment debtor? And so the court was wrong to find the answers to those interrogatories without any evidence at all and without answers to them. So those two holdings should not be affirmed. So the third question is, are the garnishees' immunities overcome by TRIO? The analysis here is very straightforward. The garnishees put forth that their immunities are provided by provisions of law. This is the Articles of Agreement that were prospectively incorporated into U.S. law by the Bretton Woods Agreement Act, the IOIA, International Organization Immunities Act, and Section 1604, the Foreign Sovereign Immunities Act. These are clearly provisions of law. They predate TRIO, and TRIO allows for execution notwithstanding any other provision of law. So TRIO, by its language, clearly overcomes their immunities. It seems like there are many different ways to look at this case and to analyze this case and to resolve this case. But the simplest one, from my perspective, seems to be that under this statute, TRIO, the assets have to be blocked, which means seized or frozen by the United States under Section 5B of the Trading with the Enemy Act or under Sections 202 and 203 of the International Emergency Economic Powers Act. It doesn't seem to me on this record that these assets were blocked in this way, not by the United States, under these statutes. Two things, Your Honor. First, on this record, we don't know the answer to that question because they didn't answer the interrogatories, but I would submit that because the Taliban was blocked, any transaction involving the Taliban- But blocked by the World Bank internally. They chose not to- Blocked by the operation of IEFA. Assets are blocked by operation of the law, regardless of whether an entity actually freezes them, and they did freeze them. Wait, so the President of the United States has the power somewhere to block the World Bank, assets that the World Bank holds? No, but he blocked the transactions with the Taliban. No, I'm just saying, does he have any authority to block the World Bank and its distribution of its assets? Well, the World Bank is an institution in the United States, and the President did block- Does it answer to the President of the United States? It does- Does the President's authority include the ability to block assets in the control- It does, Your Honor, I believe, and I believe that was shown by the license that was subsequently issued to specifically authorize the World Bank and the UN institutions to make these transfers. They aren't excused from the sanctions regulations by the fact of their immunities. The fact that their immunities are overcome- What's your response to the argument that you, when you argue that the interrogatories should have been answered or there should have been more factual development, that you forfeited or waived these arguments by saying that we don't need any additional discovery, we don't need the interrogatories, that the record as it is was sufficient for you to prevail in the court below? We did not forfeit the answers to the interrogatories in the court below. But you didn't request that they be answered before the court ruled. Well, certainly by sending them out, you don't have to follow up with the second request. Those are pending interrogatories. But there are citations to, I guess, a position that you took in the court below that the court could rule based on the record as it was that you didn't need anything more. Well, the record as it was at the time was they had failed to answer the interrogatories. So if the court can rule that they did not answer the interrogatories, but it can't rule what those interrogatories are based upon presumptions about what they are. We're not forfeiting the right to get our answers to our interrogatories. I don't think anything in the record supports the idea that we forfeit our right to get the answers to the interrogatory. Well, do you have a right to get the answers to the interrogatories if the World Bank and the IMF were not properly served? If they weren't properly served, they would need to come to court to establish- Right, but they have no obligation to answer or to answer your interrogatories until they're served. And leaving papers at the feet of a security guard is not proper service under the DC law that you're relying on to assert rights to garnishment. The Novak case held that international organizations can't simply create their own immunities by refusing service. But if you oppose service- In the case of service, you didn't go to the proper parties, people who were entitled or authorized to accept service. Security guards at these people's office buildings are not authorized to accept service. Right, but they put security guards and don't allow you into the office. To get to the proper parties, then you have to do it that way. Oh, no, no, no. There are many ways to affect service, not at the office building. I've sat on the Superior Court, so I know this. You can stake out the home of the president of the World Bank, but you don't just drop papers at the foot of a security guard at the office building. Well, the Foreign Sovereign Immunities Act has provisions for how one serves their foreign governments, and we know that these international organizations have the same protections under the FSI as a foreign nation. Spells out sort of three different ways to serve a foreign nation. Did you undertake any of those forms of service? Your Honor, Section 1608 concerns service upon a foreign state, and these entities are not a foreign state, although they are generally- The Organizations Immunities Act gives them that same protection. Correct, but that doesn't- Service of process. But that does not extend to Section 1608 as a result. No new authorities for that. Rodriguez v. Pan Am Health Organization, which went through the fact that the 1608 talks about procedures of finding the foreign minister going to the embassy, none of which apply here, because they don't have a foreign minister. Sorry, that case tells that under the International Organization Immunities Act, these foreign international organizations are not entitled to the service protections of the FSIA? That they're not granted the same service under Section 1608 that rule four service applies to these organizations. Yes. Their own articles of agreement say that they are immune from process. Their own articles of agreement are provisions of law that TRIA overcomes. If I can get back to that, that they argue that their abrogation of immunity only applies to execution immunities. The TRIA's language doesn't accept jurisdiction immunities. In fact- It doesn't have to be. I understand the conceptual flow of your argument that statute starts with notwithstanding any other provision of law. These are other provisions of law. Nothing else matters, including jurisdictional immunity. I get that. But then it's also the case that there's decisions from the Supreme Court and elsewhere that construe statutes that are similarly structured, that begin with a notwithstanding any other, name it. It's read in context to say that it actually doesn't mean notwithstanding any other provision of law, period, no matter what. It's just a reference. And what you do is you go down to look at what the meat of the provision talks about, and you ask whether that meat of the provision is in conflict with something. And if you look at the meat of this provision, it's not talking about jurisdictional immunity. It's talking about immunity from execution and attachment. And so that's the counter argument. And there's some force to it that that's what this is about. That's what this is about overcoming. It's not about overcoming everything in the world. It's about overcoming that subset of stuff that this provision is treating with. And the set of stuff that the provision is treating with relates to execution and attachment, not jurisdictional immunity. Your Honor, first, I would look to the Supreme Court's statement that this particular notwithstanding clause is a blanket abrogation of immunity. This court in Greenbaum faced the government in the position of the garnishee. And the government was asserting that there was no jurisdictional immunity over it. And it had to be had in that case because the government was the garnishee. And this court found on other grounds that it didn't have those immunities because they weren't expressed in the provision of law. But here the immunities clearly are. And I would also add to that that as far as the scope goes, it doesn't extend to elements that don't actually convict or conflict. For example, there's a Stansell case out of the 11th Circuit where the procedures of that court didn't conflict in that they didn't actually deny the substantive right. You just had to follow those procedures. And if you did, then you could still collect. And so it didn't conflict. Same thing with the other cases that this court cited in Greenbaum. For example, the Holy Land case. The abrogation did not extend all the way to assets that were already unblocked because they were taken out of the purvey of the statute. And they also referred to the Elahi case where there were provisions in the same statute that aren't overridden because it's any other provision of law. But here we have an immunity that directly conflicts with our substantive right to collect. And so TRIA overcomes it. Just as it overcomes Section 1609 and 1611. I would submit that it's a pretty strange reading to say that TRIA overcomes 1609 and 1611, but not 1604. It's just not hinted at anywhere in TRIA. But relies on the fact of the Foreign Sovereign Immunities Act, as you just said, separately addresses subject matter jurisdiction, the sovereign immunity of the foreign nation. And we know that also applies to international organizations. And then 1609 to 611 deal with execution immunity as a separate matter. So the structure of the FSIA seems to recognize that there are two different layers of immunity. The first threshold, one being, is there a waiver of sovereign immunity that gives the court subject matter jurisdiction over this foreign defendant? And the second being, if you win your case, can you engage in execution? Sorry, what was that last part? The second is, if you prevail in your case, do you have the right to execute against assets? Well, here we're not... I think that's what 1609 to 1611 are dealing with, is the execution aspect of a proceeding. With that, that's something long after we've established subject matter jurisdiction and a waiver of sovereign immunity that allows the court to adjudicate the case at all. And given that Foreign Sovereign Immunities Act itself seems to treat them as two different kinds of immunity, and the TRIA is only speaking to execution immunity, then it seems to me the separateness of 1604, in fact, cuts against you here that Congress was not abrogating Foreign Sovereign Immunity. The TRIA, it doesn't say, notwithstanding any other provision of law, except for jurisdiction immunities. It does say, except for some other things, but it doesn't make that exception. And the Supreme Court has been very clear, it's a blanket abrogation, and that to read things into the statutes concerning immunities is not the court's role. Well, the Supreme Court read that same notwithstanding clause as referring to the President's exercise of waivers of execution immunity in the past. But that is one, if they wanted to make a finite list of what provisions of law wouldn't be overcome, Congress could have done that, and it didn't. The statute... The Supreme Court also said that the way we read notwithstanding, we don't start with the notwithstanding clause, we start after that, and we say, what does this provision cover? And TRIA speaks only about execution and authority to execute. It doesn't grant jurisdiction, it says nothing about jurisdiction, it simply speaks about the authority to execute against assets. And so then we ask, well, the purpose of the notwithstanding clause, does that conflict, does applying 1604 conflict with this execution authority? And it doesn't for the reasons you said, because you said, it's 1609 and 1611 that are dealing with execution. So if someone tried to refer to 1609, they'd have a conflict, right, that the notwithstanding clause would overcome, but 1604 is just a different type of immunity altogether. It is a different type of immunity, but it's also overcome and it also conflicts. Well, it creates jurisdiction in the court, right? But 1604 is, so they're dealing with totally different matters, aren't they? When you look at what TRIA overcomes, there's no hint in the language that it doesn't overcome jurisdiction immunities. And going back to the Weinstein case in the South, sorry. There's a hint in the language of what that it overcomes jurisdiction, is that what you said? I'm sorry, I didn't quite hear. Your Honor, there's nothing in the language of TRIA that would implicate that it does not overcome jurisdiction immunity. To overcome a jurisdictional immunity, you have to talk about jurisdiction or immunity. What they talk about is any other provision of law. So then the question comes, does it conflict? And here, if section 1604 didn't exist, we would have section 1330 allowing for jurisdiction. And we would have entities subject to the court's jurisdiction, but for this conflicting provision of law that allows them immunities. Just like if we are going after assets that are held by an entity that has an execution immunity only, it would overcome that. The fact that it's a jurisdictional immunity that's overcome is really of no moment. What is your best case that says a provision that does not address jurisdiction or does not address sovereign immunity clearly can still be read to create jurisdiction that would not otherwise exist? Your Honor, I would allege that, or I would state that there's, what you're referring to is essentially what appears to be a gap in the immunity that Congress didn't account for when it drafted these statutes concerning immunity. In an NMLV Argentina, it was a similar situation. There was no immunity for discovery clearinghouses that Argentina was being subjected to. And the court asked the question, could the 1976 Congress that drafted the Foreign Sovereign Immunities Act really not meant to correct foreign states from post-judgment discovery clearinghouses? So that was a case where the jurisdiction to force Argentina to reply to discovery was at issue, and it appeared not to have been protected, and the court said the riddle is not ours to solve. Let me try this a different way. I'm going to read to you from Greenbound. We said in Greenbound, the TRIA does not expressly mention the United States, its sovereign immunity or its susceptibility to suit under the statute. Because the TRIA has nothing expressed to say about federal sovereign immunity, the notwithstanding clause cannot aid the appellate. Why doesn't that exact same analysis apply to the argument you're making? Your Honor, that was to deal with the backup position that they had come in with in that case. No, they're interpreting the notwithstanding clause, and they're analyzing it the way my colleagues have presented it to you, and then they expressly say, because the TRIA has nothing expressed to say about this, the notwithstanding clause cannot aid the appellant. I think that that applies to your argument. Well, in that case, there were two things going on. First, the question was, did TRIA override because it is a, the notwithstanding clause, did it overcome the immunities of the government? Right? And so that was the first question. Right. So just because it's used in the speech of the United States government to support sovereign immunity, it's the same analysis. If I may, Your Honor, as to that question, does TRIA stand alone overcome sovereign immunities, the answer had to be no, because they weren't not expressed in a provision of law. Okay. So that no had already been decided by the court. Here, the answer to that is yes. And so the case is over. Because Greenbaum went on to say that, in fact, federal government sovereign immunity is part of the Constitution's separation of powers, and the Constitution is just definitely a provision of law. Your Honor, the holding, though, was that it wasn't... I think we went on to say in that opinion, quite specifically, in addition, the separation of powers is a source of federal sovereign immunity, and that is the Constitution. That's part of the Constitution. But the holding was that none of these are clearly provisions of law that... The Constitution's not a provision of law? That clearly would qualify as the type of provision of law that isn't overcome. So that was my reading, Your Honor. But as far as Judge Penn's point, when you get to the second question, which is, we're no longer dealing with the notwithstanding clause. We're dealing with, is there something else here that's allowing you to overcome the And there wasn't anything else there, because it wasn't obvious that it had to do with the sovereign immunity of the United States. But that doesn't mean, Your Honor, that when Congress writes notwithstanding any other provision of law, that it's only limited... It means it's just the opposite. It's not limited. The rule is generally, unless you know of an exception, that statutory language taking away sovereign immunity, whether it's the US or a foreign government or even a state, that statutory language will not be read to strip away immunity unless it's clear. And you would certainly say, if someone said, wait, I've got execution immunity, you would go, no, here is a statute that could not be clearer about taking away your immunity from execution. Congress was quite clear. It's taking away, at least for certain folks in certain circumstances, immunity from execution. But what language, if there's a separate immunity, 1604, it's separate from 1609 to you can point me to in TRIA that clearly, unambiguously takes away their sovereign immunity from suit. Is it the notwithstanding clause or is there something else in that statute that you think provides the type of clarity that courts demand? Because I understand your arguments, but courts have to be very careful in this area because of its diplomatic and foreign relations consequences. So is there a language that gives me the clarity other than the notwithstanding clause, or we have to decide that notwithstanding clause is sufficient? Your Honor, it is the strength of this notwithstanding clause, which has been held to extend it everywhere, which has been held by the Supreme Court to be a blanket abrogation of immunity. Where did they hold it? It's a blanket abrogation of immunity. In Rubin, but within a narrow sphere. So they took a... Right, execution immunity. No, the narrow sphere is blocked assets. That's the narrow sphere. So it's not a reckless statute at all. It was a very calculated statute that it's going to overcome any provision of law that conflicts with it. No distinction between jurisdiction and... Immunity from suit at issue before the Supreme Court? No, but in Rubin, what was at issue was the rights to execute against certain assets of Iran that weren't blocked assets, right? Right. But the point is, though, that when TRIA was passed, Congress struck the balance. They don't need any new balancing to be done. They struck the balance. Any conflicting provision, no distinction between execution and jurisdiction immunities, and... But if it's a narrow, and we are told to read it as a narrow abrogation of immunity, wouldn't using the notwithstanding clause to make it a great big abrogation of immunity? Your Honor, it's to be read as a blanket, great big abrogation of immunity to a narrow class of assets. And the narrow class of assets are blocked assets. And that's why it's so broad. That's why the notwithstanding part is so broad, because the class of assets is so narrow. And we're not here, Your Honor, we're forbidden from thinking about the policy implications of this. In MLV Argentina, they said, do what the statute says. Don't consider the outcome. Don't consider the gaps. And I would submit that if we're thinking there's a gap here about jurisdictional immunities, that you're considering the gap that the Supreme Court is forbidding you from considering. And in Hulk Bank, just more recently, it said it again, that this was an immunity gap that would allow for criminal prosecution of a sovereign. And the court said, look, you've got to let the chips fall where they may. And that's what I asked the court to do, let the chips fall where they may here. By the law as it's written. The law as it's written does not say that notwithstanding any other provision of law other than jurisdiction immunities, and its scope is defined by the assets that it applies to, the type of judgment that you hold, and the type of assets that it applies to. And I submit that that's the proper reading. I'm sure my colleagues don't have additional questions at this time. We'll give you a little time for rebuttal. Thank you. Sanders. I'm Sandra Sanders for the World Bank. I'd like to start with the Greenbaum case that the court was just discussing. I do think that while my friend on the other side is right, that part of what Greenbaum is doing is talking about whether the notwithstanding clause applied to a that didn't come from a statutory source. The court then went on to talk about TRIA as a whole and went on to construe TRIA and determine whether it would supersede immunities that do not conflict with TRIA's operative clause. And so I think what the court said there really all but determines the result in this case and compels a determent. And so what the court said was that notwithstanding clause supersedes only those provisions that actually conflict with TRIA's operative clause. And that operative clause pertains to execution against terrorist parties. So I think that reasoning is exactly applicable here. The bank has jurisdictional immunity pursuant to the IOIA and the FSIA. TRIA does not say anything about jurisdictional immunity of unrelated third parties like the bank. Don't have any judgment against them in respect to the underlying terrorist act. And therefore, TRIA does not supersede that jurisdictional immunity. I think there the key question would be whether jurisdictional immunity conflicts with TRIA's abrogation of execution immunity. So as Judge Ouellette was discussing, I think it doesn't conflict for exactly those reasons. That jurisdictional immunity comes from a different source within the FSIA, comes from 1604. It attaches to the state itself or the organization, whereas execution immunity coming from 1609 attaches to the property itself. The courts have repeatedly held that the two operate independently so that you can have an organization or a state entity that is immune from suit, but its property isn't immune from execution. So for instance, state-owned oil companies, I think, are a good example of this where they might be immune from suit, but all their property is used for commercial activity. So we would think of that property as non-immune from execution. You can have that scenario all the time. And so the two types of immunity do not conflict. Everything you said about the independent nature of jurisdictional immunity versus execution and attachment immunity, does any of that turn on whether the party that's at issue is independent? Because you layered that in, and the briefing talks about this too, that the World Bank and the IMF don't have anything to do with the terrorist party, that they're independent. But why does anything you said about the independence change if you're not talking about a contention? But that's the upshot of your position. Sure. I think you're right. Legally, the independence doesn't make a difference in this case. The point is that the bank has jurisdictional immunity that hasn't been overcome. And so I think that's sufficient here. And there are situations where you have an agency or instrumentality of a state sponsor of terrorism that does allow the underlying 1605A judgment to essentially be applied against the agency or instrumentality. That's what I would think of as a situation where the party that's being attached against is not totally independent because they're part of the same state. But I think it does not matter in this situation that the bank has nothing to do. It is certainly true that the bank has nothing to do with the underlying terrorist judgment, but I don't think it legally matters. I do think the court is right to demand clarity, clear evidence that the Congress intended to abrogate international organizations' immunity here. And if I could just sort of spin that out, Congress granted this immunity in the first place because it wanted, it and the executive branch understood that these organizations would be headquartered here and that they would hold essential assets in the United States. These are foreign state assets. These are assets that are donated by the member country. And so Congress and the executive knew that these would be attractive targets for execution. And so it is precisely suits like this that Congress was trying to prevent when it granted this immunity. I think if you look at what happened here, it's a good example that the plaintiffs got the writ of attachment. They purported to serve it by leaving security guards. And then within two weeks, they were moving to final judgment of $138 million. And I think that really demonstrates that these execution procedures, they're very quick. They take place under state law procedures, and they are incredibly burdensome. So if it were the case that the bank and other organizations like it had to respond to these types of attachments within a week or two of being purportedly served with them, they would not be able to function. That is exactly the point of the immunity, to protect the assets that are here and protect the bank's ability to use those assets as it sees fit for furtherance of its humanitarian mission. Can I ask a question about the various ways in which you layered reasons you could win? So you have the argument we've just been talking about, which is that TRIA doesn't deal with jurisdiction. Jurisdictional immunity, it deals with execution attachment immunity. Then you have arguments that have also been referenced earlier about whether the case involves, even if TRIA applies, blocked assets is blocked assets of a terrorist party. Is, do we have full flexibility to choose among those? Or are we required to address the one that you put first, because that's jurisdictional and the other ones don't qualify as threshold in the way of foreign non-convenience or something that would allow us to address those as the ground on which a hypothesis we'd affirm? I do think that because the first one goes to subject matter jurisdiction, it does make for the court to address that one. And that it should address that one. I guess I would think that you might want us to, and it might make sense to just as a matter of logic, but I'm just asking, is it better flexibility? Because we all know that you don't, just because subject matter jurisdiction doesn't mean you have to do it before, for example, foreign non-convenience, which is not subject matter jurisdiction could do foreign non-convenience first. So I guess I'm just asking, where did the other arguments fit into that framework? I think they all count as Sinochem threshold arguments. And that's because the other ones go essentially to whether there's execution immunity, whether TRIA applies and renders these assets subject to execution. So I think you treat them as equal to threshold. I think all of them go to that. Whether something is a blocked asset is a jurisdictional question? I think it's a question that... No, I don't think it's a subject matter jurisdiction question. I do think it goes to whether there's execution immunity. Whether TRIA abrogates that. I don't know whether we know whether that's actually an equivalent threshold question, or is it that they haven't stated an execution claim? I can't point to a case that says it's an equivalent threshold question. I guess I was thinking of it because it's not purely jurisdictional in the sense that- So we might not be able to do that. Well, that's what I'm asking for your view on that. Your view is that blocked assets is on par, is in the same tier of the framework as foreign non-convenience, and that even though it's non-jurisdictional, it's threshold, so you can do it before subject matter jurisdiction. Yes, that's my view on that. Of course, the court is free to disagree. How do I know it's any more threshold than failure to state? An element just isn't legally alleged as a failure to state. It feels to me more like failure to state a claim for execution, which is a very threshold in the timeline of litigation, but it's not something that courts can do. I think it is a fine line, I guess I would say, in this context, because the plaintiff has to establish that the assets in question aren't immune from execution. They are entitled to 1609 immunity under the FSIA. Therefore, that is a similar threshold question. This doesn't come up that much. Every word in the sentence is self-jurisdictional-ish enough to be a threshold question. Yes, I think so, but I don't think the court has to ... The court doesn't have to agree with that in this case. I do think the subject matter jurisdiction- I mean, we would have to agree with that if we wanted to resolve- If you wanted to resolve on these other grounds. Yes, so the way you're viewing it is execution immunity, the merits is whether execution can be had. Right, and that may be state law, right? That may be other state law requirements. This case is all D.C. action, so the merits is the execution law under the D.C. cause of action for execution. But the question of execution immunity, you view it as, for these purposes, for this typology, you view it as threshold. I would view it as equally threshold. This doesn't come up that much because usually when you're talking about execution, you have a judgment already. It's way at the end, so it seems like normally this is- Right, normally there's a judgment. But I get that they have to show it. They have to get out of the FSIA protections, but that feels very weird to me to say that that's a threshold. But can we think about it this way, which is the bank has jurisdictional immunity, and the claim is that it is abrogated by the TRIA. So in order to abrogate, you have to meet every element of the TRIA, which would mean you could go with blocked assets because you can't abrogate unless you meet every element, including, for example, blocked assets. Yes, I do think that would be another way to look at it, yes. And then let everything go back to jurisdictional blocked assets. Right, and look at it that way. Right. Now, I do think the grounds we've sort of put forward first are more straightforward. They're purely legal grounds, although I do think, to your Honor's point earlier, that plaintiffs didn't satisfy their burden of showing that there were any blocked assets at issue here. The purely legal grounds, that's the question of whether the TRIA reaches jurisdictional immunity as opposed to just execution or task immunity. Is there something else that you include in the purely legal one or is that? It's definitely, it's that one. And then it's the second line argument that the Central Bank of Afghanistan, DAW Afghanistan Bank, cannot be held to be an agency or instrumentality of the Taliban. So plaintiff's theory under TRIA here is not that these assets were ever intended for the Taliban directly. That's not the allegation here. It's that they were intended for DAW Afghanistan Bank. So for TRIA to apply to those assets, plaintiffs need to establish that DAW Afghanistan Bank is an agency or instrumentality of the Taliban. That's the terrorist party under TRIA. And so- That's not a jurisdictional question. But is it? Right. The way we've been thinking about it is it goes to execution immunity. Yes. Whether TRIA applies to these assets. And I think there, the really key point is that TRIA is limited. Its permission for execution is limited to situations in which the executive branch has designated the foreign state a state sponsor of terror. And I think that's really key because what that means is that the executive branch has made a foreign policy judgment up front that particular state should be subject to execution under TRIA and all of the other sort of US law consequences that follow from that designation. But the executive has done that up front. And so here what the plaintiffs are saying, Central Bank of Afghanistan, which has not been designated a state sponsor of terror, it can essentially be executed against under TRIA because it's an agency or instrumentality of the Taliban. And we do not think the statute allows that conclusion because to hold that would be to do an end run around TRIA's definitional provision, which says that foreign states are only covered and their agencies and instrumentalities are only covered if they've been designated state sponsors of terrorism. So essentially, that holding would take away from the executive branch the ability to make that determination up front, which I think is an incredibly important part of TRIA that Conrad put in there on purpose. One concern I have with your position is about, you know, you need this up front waiver of subject matter jurisdiction, the 1604 waiver. That makes sense if you're proceeding against a foreign state sponsor. It's not going to be qualified as a state sponsor of terrorism, but TRIA is applying equally to terrorist groups and terrorist groups are not going to be qualified as state sponsors of terrorism. And so if you're going to have a judgment against sort of, I don't know if it's 50-50, we'll say half of what the TRIA is meant to apply to, it's going to happen in situations where you're never going to have that up front waiver of foreign sovereign immunity. So why would Congress have written the statute to be effectively a dead letter as to half of what it's meant to cover? So I think the way that it operates is that when you have a foreign state sponsor of then a judgment under 1605A of the FSIA. And so what that means is that the foreign state has already been held to be not immune for committing terrorist acts. And so that's what gets us to jurisdiction over foreign state sponsors of terror. And I think the best way to understand TRIA is that what it's doing is it's setting up two exclusive avenues for execution. One is against foreign states and their agencies. There has to be a judgment under 1605A that renders the state not immune. So that's how we get around jurisdictional immunity. And then the second avenue is against terrorist parties that are not state. So that preserves, that reading preserves Congress's limitation of the whole provision to state sponsors of terror. That is the government's view. Wait, sorry, I'm confused. Because your argument in your brief is that for every execution under TRIA, you're going to first have to find a waiver of foreign sovereign immunity up front. Not necessarily a waiver, but some ground on which the state is not immune. And I think TRIA itself says what that ground is going to be. What is that ground going to be against a terrorist group? So it's different for non-state terrorist groups. It's different. You don't have to find any sort of waiver of immunity because they're not immune. They're not immune. No, I understand. You're not going to have to do that to proceed in your liability determination action. But if you then still have to show under TRIA, you're going to have to show some waiver of immunity. I'm assuming that these terrorist groups aren't going to have lots of assets here in the United States. So you're going to be proceeding against some foreign entity one way or the other. And are you ever going to be able to show a waiver of sovereign immunity? Or can you give an example of how someone was able to recover under TRIA against a foreign terrorist group whose assets presumably were held by somebody else? I'm just assuming they don't hold any here that we can execute on. Right. So I think because there are these two separate avenues of receipt under TRIA, you don't ever get to immunity. So if you're attaching directly against the Taliban, let's say, so not a state party. But what happens if you attach against the Taliban that would not implicate, that would not involve... If it held assets in Citibank, for instance. So if Citibank is a garnishee, it doesn't have its own jurisdictional immunity because it's a private party. This is usually how this arises. The most common situation would be... Do U.S. banks hold assets in terrorists? I'm just stupid. I don't know. I mean, well, they may hold blocked assets, for instance, if a group that is later sanctioned, right, is transferring money, electronic funds, transfers cases, get at this. Right. So that's the most... TRIA has effect in that situation. Right. It has a very broad effect. And that's the usual situation. This is an extraordinarily unusual situation. I think that goes, again, to the fact that Congress could not possibly have intended TRIA to abrogate jurisdictional immunity for international organizations. I'm sure my colleagues don't have additional questions for you. Thank you. Mr. Nolan? Good morning. May it please the court, James Nolan for the International Monetary Fund. For the International Monetary Fund, the situation is a bit more streamlined, and that is because the fund's articles immunize it from every form of judicial process except where the fund expressly waives its own immunity. In accordance with that plain language, the Supreme Court and this court has consistently recognized the fund's absolute immunity from suit, absent its own express waiver. That was recognized, of course, in the seminal case of Jambi IFC, where the court recognized that the fund's immunity isn't tied to the immunity enjoyed by foreign sovereigns. It's separate under the BWA, and where international organizations agree in their articles of agreement for a higher level of immunity, that's what they get as opposed to IOIA default FSIA immunity. I think that's an important distinction here. In fact, it's critical to the fund's case because the sweep of the fund's immunity is broader than the protection afforded by the IOIA. That was upheld in this court in Jambal, most recently in SACS, where we were before the panel in SACS versus IMF. And SACS, of course, recognized Jam's observation that international organizations' charters can always specify a different level of immunity, and the fund's charter does just that. The fund's immunity were justly invoked, shielded not only from the consequences of litigation's results, but also from the burden of defending on the action. That's Jambal and in Jambal. Yes. Because my understanding of this is that both the IMF and the World Bank have charters that codify that or adopt the terms of the charter. So, Congress doesn't have the authority to, if they wanted to, I'm not saying they did so in this case, grant waivers of immunity. Congress can expressly aggregate a treaty, other statute, what have you, but it didn't do so in this case. I understand that, but you're saying that you're on different terms from the World Bank. Maybe I misunderstood. I don't understand how so. Yeah, let me just make it a little more clear. Immunities between the bank and the fund are different. They're both Bretton Woods entities, if you will. They came out of the same conference. But the fund's immunity is absolute. That's what the members there and all of the members that have joined the International Monetary Fund have agreed to. That immunity is stark, and I can say it. So, even if the fund's immunity is, let's just take as a given that the fund's immunity is broader just for the purpose of this, you still benefit from all the arguments that the bank's making. Your position is that you have something extra. And I guess in terms of whether you have something extra, does that something extra matter as against TRIA? Because if the other side is right, that notwithstanding any other provision of law governs the waterfront, it's not limited to execution and attachment. It applies to any provision of law period. Then does your argument that you have something extra give you something in the face of that? For sure, yeah. And let me explain it this way. So, the fund's absolute immunities that are implemented, you know, the entire Bretton Woods agreement, of course, isn't implemented in the legislation. It's just a section of the articles dealing with immunity, and that's two through nine. And that immunity is from judicial process, other legal action, archives, freedom of assets from restrictions, et cetera. But in this case, the judicial process immunity is very straightforward and really doesn't leave any opening. And it says the fund, its property, and its assets, wherever located and by whomsoever held, shall enjoy immunity from every form of judicial process, except to the extent that it expressly waives its immunity for the purpose of any proceedings or by the terms of any contract. And so, what JAM did was, well, let me back up. Prior to JAM, this court recognized that the dual immunities pre-JAM, when IOIA immunity was tied to the virtually absolute theory of immunity, gave the fund two independent sources to dismiss cases on lack of subject matter jurisdiction. Then we get to JAM, and the Supreme Court says that the IOIA immunity is tied to the dynamic interpretation, which means the restrictive theory of foreign sovereign immunity. They also recognize that that's a default rule and that international organizations can bargain for higher immunity. And the majority in the dissent said yes, and the IMF is the example of an international organization that has done just that. So, the IMF's immunities aren't tied at all to what the IOIA might derive from the Foreign Sovereign Immunities Act. It doesn't really make a difference. The Bretton Woods Agreement Act immunities from every form of judicial process are a separate enactment. They're not affected by the immunity of foreign sovereigns. So, if- Is that separate enactment, a provision of law? It is, yeah. But TRIA only deals with execution immunity. But even if you construed it to allow- to vitiate the jurisdictional immunities of someone under the FSIA, it never carries over to the BWIA. Right? Why? Because we're not tied to foreign sovereign immunity. The Foreign Sovereign Immunities Act- Right. It's still a provision of law. I thought that's the- Yeah, but the- The other side's argument is right, that TRIA covers every provision of law. Yeah. Then everything you're saying may be true, that you have something extra beyond foreign sovereign immunity as conventionally understood. But the things that you're still bringing into it are provisions of law, as to which their uber-allocated argument that every provision of law is governed by TRIA would still seem to govern those. Right, right. But how could the notwithstanding any of the provision of law, you may execute, vitiate jurisdictional immunities that are separate, right? Residing in the individual or the juridical entity, in this case, the fund. So then are you saying you're not even talking about the U.S. statute that gave effect to the Bretton Woods Agreement? You're saying that the Articles of Agreement themselves, even if the Bretton Woods Agreement, the FSIA is overcome by TRIA's notwithstanding clause, and the Bretton Woods Agreement enactment, the statutory enactment that Congress did, if that's overridden by the TRIA notwithstanding clause, you say we have number three? We have Actuals of Agreement- No, no, no. The point is this, if a third party who's not a terrorist, not a state sponsor of terrorists, and not covered by the Foreign Sovereign Immunities Act, right? Our position, and I think it's consistent with the bank, is if you read TRIA, you have to read it in context of the Foreign Sovereign Immunities Act. The notwithstanding language is, the notwithstanding term is a signal that it's superordinating, but superordinating as to what, right? It can't mean that- But you are in the same position as the bank. I thought you said you were in a different position because of your Articles of Agreement. We are. Let me get to that. The notwithstanding any other provision of law, right, for people that fall under the Foreign Sovereign Immunities Act, right, would require a separate jurisdictional waiver. I don't know how, if someone wasn't a state sponsor of terrorism, not an agency or instrumentality of the state, or even a terrorist organization, you still have to have a reason to bring them into court, to bring them before the court, right? TRIA can't be read to vitiate all those. Citibank, for example, still has defenses, personal jurisdiction, and the like. Can you stick with the IMF? Like, why can't I? No, and for the IMF, it's even broader. That's what I'm trying to understand. Yeah, yeah, yeah. So IMF is even broader than that because while it is still an IOIA entity, the executive order that implements it as an IOIA entity says it doesn't abridge any of the immunities under the BWAA, right? So, and that's what was recognized in JAMA and consistently recognized. Doesn't it say that about the World Bank as well? Sorry? Doesn't it also say that we're codifying the immunities for the World Bank? I'm trying to understand. Sure, yeah, but the immunities under the articles are different. Ours is... So regardless of what the immunities are under the articles, if there is some statutory acceptance of the articles, regardless of what they are. Yeah, it's actually codified. Not the articles, the immunities under the articles. Okay. Consistently the way it's done. Fine, that's great. I guess what I'm trying to understand is why is it that if you're relying on this codification that some different statute, such as TRIA, if it's interpreted this way, can't waive the immunity that was at least the codified version of it? Yes. It can, can it not? A statute, Congress can enact a statute, the president can sign it, make it law. It could say we're revoking the BWAA immunities. Maybe one day when they would do that is they would encompass it within any provision of law, which is what that says, because that's a provision of law. I mean, it sounds to me like what you're saying is that notwithstanding any provision of law, you see three readings of that, not two. One, the two that we've been talking about in the main is either that it doesn't extend to jurisdictional immunity, but it's talking about execution and attachment immunity. Sure. Commensurate with the rest of the provision, or it covers every other provision of law. It seems like you're saying, no, there's an intermediate one, which is that when it says notwithstanding any provision of law, it goes beyond execution or attachment immunity, but it governs other FSIA immunity, but it doesn't reach non-FSIA immunity, even if that non-FSIA immunity is a provision of law. No, that's not what I'm saying. Oh. I'm saying, and I'm sorry if I wasn't clear, the notwithstanding language in the tree of deal with execution immunity, right? Well, but I'm, that's, that's the question. You definitely win if that's true. And all I'm saying, I guess I think the question that all of us are asking is, let's suppose that's not true. Let's suppose you lose on that graph. That the other side is right. That notwithstanding any other provision of law actually isn't stabbing to execution or attachment immunity. It is, it addresses all provisions of law, not just provisions of law that relate to execution or attachment immunity. It relates to all provisions of law. And the question is if it does, so if you lose on the point that any other provision of law only relates to execution or attachment immunity, why are you better off because then the world banker than any other entity, because. Your grounds for saying you're better off are also provisions of law. Yeah. But how could it be that Tria could be read? Remember tree is an execution statute. We went through that, the notwithstanding language, we went through Greenbaum. The latest pronouncement on that from this court, but in context, how can free a possibly way, for instance, city banks do process rights could never be read that. Right. So if it can never be read, no statute can waive the constitution. So that's a different point. Right. But if, if, if you're right, you're right. You're not constitutional. So no, but there, here's the difference. I don't know how you could have an, a reading of Tria that would allow, um, someone to execute on assets held by a third party, say it's the city bank example you have, right. Or, or let's use bank X. They have one branch, California, and somebody gets a judgment here and they want to execute on it here against bank X. Right. How do you bring bank X into court here? You still have to bring them before the court to make them deliver. It's an impersonal judgment under the PC code. So how could Tria be read that broadly? I don't know how it could. Right. And so if you're in, even if you're in the FSA context, if Tria is an execution statute, I don't think it vitiates all of the, uh, jurisdictional, um, jurisdictional points that are preserved, not accepted under Tria. I mean, that's the broadest reading, I think. So the, so if we're not in that FSIA regime, because although we, we can be, because the IOIA, our immunities are broader, that's been recognized by every court. We're not within that regime. So whatever immunities may flow through or be derived from that scheme wouldn't apply to us because we're like the third party. Because the DWAA is different. It doesn't touch the same sphere. Right. All right. Let's see. I think we have your. I just had another question because you, you make a service argument, uh, failure of service argument as well. Sure. Um, would you agree that we could resolve the case on background? We don't have. What do you mean? We, we, we, we're. I think we could decide up front because it goes, it also goes to sort of personal jurisdiction over, um. Not only weren't we served, but we can't be served. Right. Because we're immune. I'm just asking whether a service issue could be decided and that would take care of your case, but there's nothing that bars us from deciding. We don't have, we have two options on the table. We have lots of options on the table, but we'll say we have subject matter, jurisdiction, sovereign immunity waiver question, and we have the service question. I assume you would agree since you raised both of them to us that you win under either one. I don't, I don't think the court had anything to even address if no one was served. Right. The fun. Let me try this question again. We could rule for you on either ground, one or the other. Sure. There's nothing that bars us. There's nothing that there's nothing that company about jurisdictional ordering would borrow us from deciding service question in your favor rather than the subject matter immunity. There's nothing that would bar you from doing that, but the court, but our point, our central point is this, and I hope I've explained it correctly, but if you go through the brief, you'll see that our position is pretty clear. And I think it's consistent with the way this court in every case has decided it. Right. The fund has higher levels of immunity under two through nine of the Bretton Woods agreement implement implemented by the Bretton Woods agreement act. And those are the highest levels of immunity you could possibly have. Right. And it's meant to be that way. We've got sovereigns from hundred and ninety different sovereign states with different jurisdictional procedures. You have to phrase it that broad, that probably right. All right. Each of my colleagues and I have different questions. Thank you. Mr. Thornton, we'll give you three minutes for a rebuttal. I only have five points. Um, first on, on the question of could service if they weren't served, does that resolve it? Yes, that would resolve it. We didn't probably properly serve them. It's resolved, but, but, uh, they had waived the 16 and wait issue issue by not raising that to the district court. And I believe that Novak, um, instructs that they're not allowed to make their own immunities by stopping the process server. Um, um, to judge Millett's point about structure of TRIA, excuse me, that it in fact has two animating types of judgment. One is against the sovereign. One is against the terrorist entity. And because of that, it's set up in such a way that you might have an instance where you are, you have a judgment against the terrorist entity and that terrorist entity, because of the fluidity, the range of types of control that occur gets control of a state agency. And that's what's happened here. And I would submit by having it set up like this, that the Congress could have foreseen that DAB would be a blocked entity, just as it was in the nineties, just as it is again today. And that you might have a situation where you've got a sovereign entity that's controlled by a terrorist judgment debtor. And that, uh, you don't have an underlying judgment against the sovereign, yet you have TRIA action against blocked assets of that sovereign, uh, agency, because it's also your judgment debtor since brutality. Um, and this could happen, for example, if you've got a judgment against Hezbollah and Hezbollah, there's a bank account, uh, that belongs to Lebanon and they're sending money to Hezbollah, those, those assets would get blocked. And I would submit that the Congress in, in 2002, the past TRIA would want the victims to collect those assets and express TRIA that way. Um, as far as the funds immunities, as was pointed out, they're still based on, uh, immunities of law and concerning, uh, uh, judge pants question of, of granting of, uh, executive waivers that the point of TRIA was to overcome the president's ability to do that except pass in, in subsection B. So it's not withstanding any other provision of law and except as provided subsection B. So there can be no, uh, there can be no other way to overcome our, our judgment. Um, and then I just like to turn to Greenbaum for just a second. It was the case that the opinion sets out two sections. One was dealing with the notwithstanding clause and it was facing the government in the position of garnishy. And it looked at whether the notwithstanding clause would overcome its immunity. And it, and it said, no, because it's immunities were not based on provision of law. So if it's an immunity based upon a provision of law, it would have overcome the government sovereign immunity. A plaintiff made, made an argument that the definition aside from the notwithstanding clause, and this is subsection two of the opinion, plaintiff argued that the definition of blocked assets sort of inherently implies that we should be able to do this because what's the point of having these blocked assets if we can't collect them? It was a bad argument, right? And, but even concerning that, this court said that the text was ambiguous, right? And if it's ambiguous, I would submit that you can't use it then to come back and say that the notwithstanding clause clearly doesn't overcome jurisdictional immunities. Subsection one says, if it's a, if it, if it's a, an immunity expressed in a provision of law, it's overcome and you get jurisdiction. It's not heads. I went tails. You lose. We, we, we satisfied section one here. We went that, that, that's my read of that. And finally to read it another way, you know, I, I would just instruct that the Supreme Court is very protective of immunities and abrogations of those immunities and that the courts are not to fill the gaps in the immunities and they're not supposed to consider the parade of horribles and the negative consequences. But here, you know, this is, these assets and what is, what is a blocked asset? If these aren't blocked assets, yes, we have no case because these aren't blocked assets, but we don't have the answer to the interrogatories. And I believe we don't have the answer to the interrogatories, but if they answer them, the answer would be yes, because it's a blocked asset. If it falls under the IEPA prohibition from transfer. And these were transfers to Taliban controlled entities, bank. And so they would have had to have been blocked. They were frozen. Now, if you freeze them for some other reason, that doesn't make them cease to be blocked assets under, under the prohibition from dealing with entities controlled by the Taliban. They're still blocked assets. And as to those assets, this court in Levin instructed that the purpose of TRIOD is to disrupt terrorist financing. Here, if they had not frozen those assets, those assets would be sent to either Dab or some other entity in Afghanistan. We don't know. So the question of whether that entity has sovereign immunity, we don't know what the entity is. Okay. So it can't be decided on that ground because the World Bank admitted that it deals with private entities and funds. So say there's a construction company in Afghanistan that the Taliban has taken over. The World Bank freezes a payment to it and blocks it. Right. So. Okay. I think we, I think we have that part of your argument. Okay. Okay. Well, you know, if Congress is not doing something reckless here, it's doing what it wanted to do, which was take those assets and make it so they don't get to those terrorists. That's, that's the OFAC blocking part. And then with TRIA to take them out of the equation so that they can never make their way back to those terrorists. So that, that's what happens. And so that's what we're asking the court to do is enforce the law as it's written. And that it is, it is directed at terrorist financing and it's directed at who's out of pocket and here who's out of pocket, whatever that entity in Afghanistan that was about to get those payments. And it's, it's overlords the Taliban. And that's what this is about. Thank you. Thank you, counsel. Thank you to all counsel. We'll take this case under submission. Thank you.
judges: Srinivasan, Millett, Pan